IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEBORAH A. ALTMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 07-167 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Deborah A. Altman and Defendant Michael J. Astrue, Commissioner of Social Security.[1] Plaintiff seeks review of a final decision by the Commissioner denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* For the reasons discussed below, Plaintiff's motion for award of benefits is granted and Defendant's motion is denied.

---

[1] Pursuant to Fed. R. Civ. P. 23(d)(1), Michael J. Astrue, who became Commissioner of Social Security on February 12, 2007, is substituted for Jo Anne B. Barnhart in this action; *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.")

1

## II. BACKGROUND

### A. Factual Background

Following graduation from high school in 1988, Plaintiff Deborah A. Altman held a series of jobs as a waitress, classified ad writer for a newspaper, production and planning coordinator for a window manufacturer, and an optician/manager for an optometrist's office. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 8, "Tr.," at 111, 113.) In November 1999, Plaintiff quit her job working for a parcel delivery company when she was told she could not drive after she became "very dizzy all the time" during the last months of her pregnancy. (Tr. 112.)

After her second child was born by cesarean section in January 2000, Plaintiff began experiencing abdominal pains and discomfort. Although her symptoms improved for a short period, the pain gradually became more diffuse, spreading through her neck, thoracic and lumbosacral spine areas, and all extremities. (Tr. 1032-1033.) On April 15, 2001, she was admitted to the Latrobe Area Hospital ("LAH") due to atypical left sided chest discomfort; all tests to determine if the pain was related to cardiac problems were negative. (Tr. 159-206.) Later that month, in an attempt to alleviate her continuing pain, she underwent a laparoscopy to remove adhesions between her bladder and her uterus which had occurred following the cesarean section. (Tr. 210.)

2

That same month, at the suggestion of her primary care physician, Dr. Timothy P. Gaul, Plaintiff began consulting with Robert Majcher, a licensed social worker who provided psychological counseling through a clinic in Greensburg, Pennsylvania. (Tr. 114.) She reported to Mr. Majcher that following the birth of her child in January 2000, she had experienced "multiple health problems," was "constantly moody," and had decreased memory and concentration. (Tr. 328.) She continued to see her therapist about twice a month, being treated conservatively with cognitive therapy to help her address her family stressors, health problems, sleep disturbances, and mood swings.

In May 2001, Plaintiff began a program of physical therapy at LAH some five months after she injured her left arm and shoulder. She was diagnosed with left rotator cuff tendonitis and underwent a series of six therapy sessions together with conservative home treatments. On discharge, Ms. Altman reported having "good days and bad days" with continued pain in her left shoulder. The physical therapist noted, "Little progress was made toward long-term goals/expected outcomes secondary to the continued pain." (Tr. 212-232.) On July 6, 2001, during a follow-up session with a specialist in physical medicine and rehabilitation, Ms. Altman reported that she had been doing "rather well" with "only very mild left shoulder pain." The physician noted her condition was "significantly improved" and told Ms. Altman she could return to

3

her regular activities "as tolerated." (Tr. 233.)

Ms. Altman was admitted to LAH again on August 1, 2001, this time undergoing a hysterectomy in an attempt to alleviate her continuing abdominal pain. In November 2001, she returned to the LAH emergency room, complaining that she was dizzy, her jaw "felt tight," and she was experiencing difficulty swallowing and occasional visual disturbances.

In December 2001, Ms. Altman consulted with Dr. Maria Sunseri, a neurologist, reporting episodes of dizziness for two months and visual problems accompanied by severe nausea, episodes of nearly fainting, and uncontrollable shaking in her right arm. Dr. Sunseri concluded that Plaintiff was suffering from basilar migraine headaches and prescribed medication to minimize the risk of dizziness. (Tr. 634-635.) On February 22, 2002, Ms. Altman reported that her dizziness had improved, occurring only "momentarily once a day." She had never taken the drugs prescribed in December because her headaches had improved with over-the-counter medication. (Tr. 632-633.)

In March 2002, Dr. Gaul finally concluded that Ms. Altman was suffering from fibromyalgia,[2] a diagnosis which was confirmed in

---

[2]  According to the Merck Health Encyclopedia, fibromyalgia is a common chronic problem characterized by body-wide pain in joints, muscles, tendons, and other soft tissues. It has been linked to fatigue, morning stiffness, sleep problems, headaches, numbness in hands and feet, depression, and anxiety; it can develop along with other musculoskeletal conditions such as rheumatoid arthritis or lupus. The actual cause of the disorder is unknown and there is no proven prevention or cure. The overwhelming characteristic of

4

July 2002 by a rheumatologist, Dr. Neil Braunstein.  (Tr. 552-554.)

B.    Procedural Background

Plaintiff filed a protective application for disability insurance benefits on May 10, 2002, alleging disability as of January 28, 2000, due to fibromyalgia.  (Tr. 101-103, 112.) Following denial at the state agency level, she sought a hearing before an Administrative Law Judge ("ALJ") which was held by the Honorable John J. Mulrooney on April 9, 2003.  On June 16, 2003, Judge Mulrooney issued his decision (the "June 2003 opinion"), again denying benefits.  (Tr. 12-24.)  Plaintiff appealed this decision to the Social Security Appeals Council which determined there was no reason under its rules to review the decision and therefore affirmed the ALJ's opinion.  (Tr. 5-7.)

Plaintiff then appealed to the United States District Court for the Western District of Pennsylvania which again affirmed. (See Altman v. Commissioner of Social Security, CA No. 03-1653, Doc. No. 10, dated March 10, 2004.)  However, the United States

---

fibromyalgia is defined tender points which occur symmetrically at 18 points on the back of the neck, shoulders, chest, lower back, buttocks, thighs, elbows, and knees.  The pain is commonly described as deep-aching, radiating, gnawing, shooting or burning, and ranges from mild to severe.  Although the pain associated with fibromyalgia is similar to that which occurs with arthritis, there is no significant swelling, destruction, and deformity of joints in fibromyalgia as there is in diseases such as rheumatoid arthritis.  A diagnosis of fibromyalgia requires a history of at least three months of widespread pain and pain responses in at least 11 of 18 tender point sites.  Laboratory, x-rays and other tests are chiefly used to rule out other conditions that may have similar symptoms.  See health encyclopedia at www.mercksource.com., last visited December 17, 2007.

Court of Appeals for the Third Circuit reversed the District Court's decision and remanded the case for further consideration of a functional capacity evaluation ("FCE") performed on April 8, 2003, which had concluded Plaintiff was not capable of even sedentary work on a full-time basis. (Tr. 502-507; *see also* Altman v. Comm'r of Soc. Sec., No. 04-1831, 2005 U.S. App. LEXIS 4162 (3d Cir. Mar. 10, 2005)).

While review of her initial application was still in progress, Plaintiff filed a second application for DIB on October 29, 2003, claiming disability due to fibromyalgia, depression, pain and headaches as of June 17, 2003, the date immediately following Judge Mulrooney's decision. (Tr. 833-835; 843.) That application was also denied at the state level and Plaintiff again sought a hearing before an ALJ. The hearing was held on December 6, 2004,[3] before the Honorable Edward J. Banas, who issued an opinion on December 21, 2004 (the "December 2004 opinion"), again denying benefits inasmuch as Plaintiff could perform a significant range of sedentary jobs readily available in the local and national economies. (Tr. 804-812.)

In the interim, the District Court, in accord with the Court of Appeals' decision, had remanded the June 2003 decision regarding Plaintiff's first benefits application to the Appeals Council.

---

[3] The transcript of this hearing appears to have been omitted from the record.

6

(*See* CA No. 03-1653, Doc. No. 17, Order of May 6, 2005.) On January 30, 2006, the Appeals Council issued an order remanding the December 2004 opinion, directing the ALJ to reconsider two unexplained findings therein as well as the questions raised by the Court of Appeals regarding the FCE as it was discussed in the June 2003 opinion. It further ordered that the ALJ was to update the treatment evidence, offer Plaintiff an additional opportunity for a hearing, secure evidence from a vocational expert, and issue a new decision. (Tr. 510-512.)

A hearing was held on September 5, 2006, at which Plaintiff was represented by counsel. Judge Mulrooney issued an opinion on October 27, 2006 (the "October 2006 opinion"), again denying benefits inasmuch as he concluded Plaintiff could perform a limited range of light work. (Tr. 486-497.) On December 11, 2006, the Appeals Council concluded it would take no further administrative action with regard to October 2006 opinion which therefore became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on February 9, 2007, seeking judicial review.

C.   Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that

an individual may obtain judicial review of any final decision of
the Commissioner by bringing a civil action in the district court
of the United States for the judicial district in which the
plaintiff resides.

## III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining
whether the Commissioner applied the correct legal standards and
whether the record, as a whole, contains substantial evidence to
support the Commissioner's findings of fact. 42 U.S.C. § 405(g);
Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of
Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of
fact by the Commissioner are considered conclusive if they are
supported by "substantial evidence," a standard which has been
described as requiring more than a "mere scintilla" of evidence,
that is, equivalent to "such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." Richardson, id.
at 401. "A single piece of evidence will not satisfy the
substantiality test if the [ALJ] ignores, or fails to resolve a
conflict, created by countervailing evidence." Kent v. Schweiker,
710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision
and does not re-weigh the evidence presented to the Commissioner.
Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006),
*citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d

8

Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. **LEGAL ANALYSIS**

### A. The ALJ's Determination

In determining whether a claimant is eligible for disability insurance benefits, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[4] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). A disability insurance applicant must also show that

---

[4] According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

9

she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Ms. Altman satisfied the first two non-medical requirements and the parties agree that Plaintiff's date last insured was December 31, 2004. Therefore, a critical element in this case is for Ms. Altman to show that she became disabled prior to that date.

To determine a claimant's rights to DIB,[5] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, she cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, she is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC")[6] to perform her past relevant work, she

_____

[5] The same test is used to determine disability for purposes of receiving either DIB or supplemental security income ("SSI") benefits. Burns v. Barnhart, 312 F.3d 113, 119, n1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both SSI and DIB applications.

[6] Briefly stated, residual functional capacity is the most a claimant can do despite her recognized limitations. Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8

10

is not disabled; and

(5) if, taking into account the claimant's RFC, age,
    education, and past work experience, the claimant can
    perform other work that exists in the local, regional or
    national economy, she is not disabled.

20 C.F.R. § 416.920(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that she is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[7] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

After summarizing the history of Plaintiff's applications for DIB dating from May 2002 and October 2003, Judge Mulrooney concluded at step one of the prescribed analysis that Ms. Altman had not engaged in substantial gainful activity since her alleged onset date of January 28, 2000. (Tr. 496.) Resolving step two in Plaintiff's favor, the ALJ concluded she suffered from fibromyalgia, rotator cuff tendonitis, elbow tendonitis, myalgia/myositis,[8] chronic pain syndrome, migraine headaches,

hours a day, for 5 days a week, or an equivalent work schedule."

[7] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n5 (1987).

[8] Both "myalgia" and "myositis" refer to muscle pain, the latter in particular from infection or an unknown cause. *See* the on-line medical dictionary provided by the National Institutes of Health at www.nlm.nih.gov/medlineplus, last visited December 17, 2007

                                11

dysthmia,[9] and anxiety/panic disorder, all of which were "severe" as that term is defined by the Social Security Administration.[10] On the other hand, he concluded the medical evidence did not support a finding that Plaintiff experienced any residual limitations from her previous bladder surgery or hysterectomy; consequently, those conditions would have "no more than a minimal impact" on her ability to engage in work-related activities and were considered "non-severe." (Tr. 488.)

At step three, the ALJ concluded that Plaintiff's conditions did not satisfy any of the criteria in Listing 1.00 (musculosketal system), 11.00 (neurological system), or 12.00 (mental disorders). (Tr. 488.) He specifically considered Ms. Altman's argument that the severity of her headaches satisfied Listing 11.00, but concluded there were no objective signs, symptoms or medical findings to support that argument. He then exhaustively reviewed

("MedlinePlus.")

[9] Dysthmia is a mood disorder characterized by chronic mildly depressed or irritable mood often accompanied by other symptoms such as eating and sleeping disturbances, fatigue, and poor self-esteem. See medical dictionary at MedlinePlus.

[10] *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. Yuckert, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. Id. at 146, n5.

12

Ms. Altman's work history, activities of daily living, medical records, and subjective allegations of disabling pain, discomfort, fatigue, and mental problems (Tr. 488-494) before concluding at step four that Plaintiff's residual functional capacity was insufficient for her to return to any of her previous work. (Tr. 494.) However, despite her mental impairments, Ms. Altman retained the residual functional capacity to perform "simple, routine, repetitive tasks, not performed in a fast paced production environment, involving only simple, work related decisions, and in general relatively few work place changes." (Tr. 494.) Her exertional restrictions would limit her to a light[11] range of work which involved only occasional postural maneuvers or overhead reaching, pushing or pulling, and excluded crawling and climbing ladders, ropes and scaffolds, and exposure to dangerous machinery and unprotected heights. (Tr. 495.) A vocational expert ("VE") who testified at the hearing stated that a person of Plaintiff's age, education, and work experience who was limited as the ALJ described could perform the unskilled light jobs of parking lot

---

[11] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b) and 416.967(b). A person who is able to do light work is also assumed to be able to do sedentary work unless there are limiting factors such as loss of fine dexterity or the inability to sit for long periods of time. Id.

13

attendant, spotter in a glass manufacturing center, or assembler of electrical equipment or the unskilled sedentary[12] jobs of surveillance system monitor, semi-conductor bonder, or printed circuit board inspector, all of which were readily available in the local and national economies. (Tr. 495.)

Based on Plaintiff's status as a younger individual[13] with a high school education, the ability to communicate in English, a work history which provided no readily transferable skills, the medical evidence of record, and the testimony of the VE, the ALJ determined at step five that Ms. Altman was not disabled and, consequently, not entitled to benefits. (Tr. 495.)

B.   Analysis

In the brief in support of her motion for summary judgment, Ms. Altman argues that the ALJ erred in his analysis for three reasons.[14]   First, the ALJ erred by determining that her

---

[12]   The term "sedentary" describes work which requires lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.   Jobs are sedentary even if walking and standing are required occasionally and other sedentary criteria are met.   20 C.F.R. § 404.1567. A sedentary job should require no more than approximately 2 hours of standing or walking per eight-hour work day, and sitting should typically amount to six hours per eight-hour work day.   Social Security Ruling 83-10.

[13]   Plaintiff was 29 years old on her alleged onset date and 33 years old on her date last insured, making her a "younger" person according to Social Security regulations.   20 C.F.R. § 404.1563(c).

[14]   Plaintiff also raises a fourth argument, i.e., because of the ALJ's erroneous credibility determination and his improper rejection or evaluation of medical evidence, the ALJ erred in his conclusion that Plaintiff's impairment(s) did not satisfy one of the Listings. (Plf.'s Brief at 6.)   However, the argument is not developed beyond this statement and the Court declines to consider it further.

14

subjective allegations regarding pain and secondary limitations were exaggerated and not fully credible because he failed to evaluate those allegations pursuant to Social Security Ruling[15] ("SSR") 96-7p, "Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements." (Plaintiff's Brief, Docket No. 13, "Plf.'s Brief," at 6-10.) Second, contrary to three other Social Security rulings, the ALJ failed to identify the evidence on which he relied to contradict the opinions of Plaintiff's long-term treating physician, Dr. Gaul, concerning the severity and effects of her impairments. (Id. at 10-11.) Finally, because the ALJ erred in his determination of Plaintiff's residual functional capacity, his hypothetical question to the vocational expert was incorrect; consequently, the VE's testimony that there were jobs in the national economy that Plaintiff could perform despite her limitations cannot be relied upon as substantial evidence. (Id. at 11-12.) Because we agree that the ALJ failed to give proper weight and/or failed to analyze completely the functional capacity evaluation of April 2003 and Dr. Gaul's opinion of November 12, 2004, particularly in light of the direction given by the Appeals Council and the Third Circuit Court

---

[15] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, citing 20 C.F.R. § 402.35(b)(1). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., quoting Heckler v. Edwards, 465 U.S. 870, 873 n3 (1984).

15

of Appeals on remand, we need not reach Plaintiff's other arguments.

      1. *Instructions to the ALJ on Remand:* As noted above, the primary issue on remand from the Third Circuit was the ALJ's failure to give "proper" weight to a report dated April 8, 2003, finding that Plaintiff was limited to part-time sedentary work. (Tr. 505.) The evaluation giving rise to the report was conducted at Dr. Gaul's request and the report was jointly signed by two physical and occupational therapists. On June 20, 2003, the report was reviewed and signed by a medical doctor, whose signature the Court of Appeals described as "an illegible scrawl." (Id.) In the June 2003 opinion, Judge Mulrooney had concluded the report did not reflect a medical doctor's opinion and stated that the opinions of the physical and occupational therapists would not be given controlling or great weight in his RFC analysis. The Circuit Court noted that this report "may have been pivotal in the ALJ's decision making process because during the hearing the ALJ declared 'if [Ms. Altman] was limited to part-time sedentary activity, I wouldn't send her back to work.'" (Tr. 506; *see also* Tr. 64-65.) The Court concluded that had the ALJ taken into account the fact that the report was reviewed and approved by a medical doctor, he may have given it greater weight. Since he failed to offer a clear explanation of why this medical evidence was rejected, the matter would be remanded. (Tr. 506-507.)

16

On remand, the Appeals Council noted that the FCE report was part of the record on which both the June 2003 and the December 2004 opinions relied.[16] Therefore, the Council directed the ALJ to reconsider this report in arriving at the new decision which would determine whether Plaintiff became disabled before her date last insured, December 31, 2004. (Tr. 510-511.) Its instructions were for the ALJ to

> expressly evaluate the June 20, 2003 medical source opinion . . . under the applicable guidelines (20 CFR 404.1527 and Social Security Rulings 96-2p and 96-5p.) . . . The [ALJ] will explain the reasons for the weight he gives to this opinion evidence.

(Tr. 511.)

2. *Relevant Law:* We begin our analysis with a brief summary of the relevant law. Social Security regulations identify three general categories of "acceptable medical sources" – treating, non-treating, and non-examining. The term "acceptable medical sources" encompasses licensed physicians, optometrists, and podiatrists; licensed or certified psychologists; and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). Those acceptable medical sources who have provided the claimant with

---

[16] Although the Appeals Council accurately pointed out that the FCE report was part of the record the ALJ should have considered in arriving at his December 2004 decision, it is not mentioned therein. While an ALJ is not required to discuss every item of evidence, particularly when the medical records are "voluminous," as they are in this case (Fargnoli v. Halter, 247 F.3d 34, 42 (3d Cir. 2001)), it would seem that this report is significant enough to have merited some mention, particularly since the ALJ wrote that "there is little in the way of objective evidence to support the claimant's allegations." (Tr. 809.)

17

medical treatment or evaluation and who have had an "ongoing treatment relationship" with her are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with her, for example, a consultative examiner who is not also a treating source. Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records. 20 C.F.R. § 404.1502.

Social Security regulations also carefully set out the manner in which medical opinions are to be evaluated. 20 C.F.R. § 404.1527(d). In general, every medical opinion received is considered, regardless of its source. However, it is well-established that an ALJ "must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all." Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993). Unless a treating physician's opinion is given controlling weight, the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment

relationship (more weight given to the opinions of specialist than to generalist treating sources.) 20 C.F.R. § 404.1527(d); *see also* Fargnoli v. Halter, 247 F.3d 40, 43 (3d Cir. 2001), and Sykes, 228 F.3d at 266, n.7. The opinions of a treating source are given controlling weight on questions concerning the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); *see also* SSR 96-2p,"Giving Controlling Weight to Treating Source Medical Opinions."

The regulations also state that evidence of a claimant's impairment may be provided by "other" medical sources such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. 20 C.F.R. § 404.1513(d). This evidence, although from medical sources, has in the past been given little weight as compared to evidence provided by "acceptable" medical sources. However, on August 9, 2006, the Social Security Administration published Ruling 06-03p, "Considering Opinions and Other Evidence from Sources Who Are Not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Non-governmental Agencies." The Ruling re-enforced the policy of giving weight to medical opinions according to the hierarchy

outlined just above, but reflected a recent change in how medical care is provided in this country. That is,

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file. . . . The weight to which such evidence may be entitled will vary according to the particular facts of the case, the source of the opinion, including that source's qualifications, the issue(s) that the opinion is about, and many other factors. . . . Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.

SSR 06-3p at 4-5.

The Ruling further noted while "other sources" cannot establish the *existence* of a medically determinable impairment, they "may provide insight into the *severity* of the impairment(s) and how it affects the individual's ability to function." SSR 06-3p at 3 (emphasis added.) The opinion of such a source should be evaluated using the same factors as those used in weighing the opinions of acceptable medical sources, e.g., how long the source has known and how frequently he has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well he explains his opinion; whether he has a specialty or area of

20

expertise related to the individual's impairment(s); and any other factors that tend to support or refute the opinion. SSR 06-3p at 5. Finally, the Ruling states that "[a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions for these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." Id. at 6.

3. *The ALJ's Treatment of the April 8, 2003 Report:*
Turning to the factual evidence related to the therapists' report in question, the record shows that on April 7, 2003, Ms. Altman followed-up with Dr. Gaul on the effect of trigger point injections she had received on March 24, 2003. Those injections had given her "about a day's worth of relief," and some "untoward side effect." She continued to experience difficulty with sleep and pain in her lower extremities and told Dr. Gaul she would like to have an occupational physical therapy evaluation. (Tr. 1212-1213.)

Dr. Gaul arranged that evaluation for the following day at Mercy Jeannette Hospital. A physical therapist and an occupational therapist compiled a medical history based on Plaintiff's reports, administered tests designed to objectively assess the true level of

21

her pain, and performed physical tests to determine Plaintiff's work-related capabilities. (Tr. 462-468.) The physical therapist concluded Ms. Altman was "best suited for sedentary work with occasional lifting of light objects/carrying of objects with occasional walking or standing during the day." (Tr. 463.) The occupational therapist then evaluated Plaintiff's functional capacity by conducting a series of physical exertion tests, for example, the greatest weight Ms. Altman could lift from the floor to waist level and the maximum amount she could push or pull. (Tr. 465-466.) From these tests, the therapist determined the number of hours per day Ms. Altman could perform work-related tasks such as sitting, standing, walking, other postural activities, lifting weight to different levels, carrying, pushing, pulling, using her hands and feet, operating vehicles, and traveling. The occupational therapist concluded Plaintiff would be limited to part-time sedentary work in a job which would allow for change of position at will, limited upper extremity use, and no overhead work. Moreover, "due to variability of symptoms daily with fibromyalgia, her performance will vary." (Tr. 468.)

In the June 2003 opinion, the ALJ had stated with regard to this evaluation:

As to the opinion of physical and occupational therapists, their opinions are not controlling or given great weight for the purposes of establishing residual functional capacity. . . . Accordingly, great weight is not afforded [their] opinion[s] . . . insofar as they suggest an inability to perform light work activity in

22

accordance with the above residual functional capacity.

(Tr. 20.)

On remand, the ALJ stated in the October 2006 opinion that he

had:

> . . . considered the opinion of a physical therapist,
> dated April 3 [sic] 2003, that the claimant could perform
> only a reduced range of sedentary work. However, a
> physical therapist is not an acceptable medical source
> for Social Security purposes (20 CFR 404.1513). While
> the treating physician countersigned this residual
> functional capacity [evaluation], he did not do so until
> June 20, 2003, some three months after it was completed,
> and there is no indication that he was present during or
> participated in the evaluation (Exhibit 25F). . . .This
> doctor's opinions, and the opinion of the physical
> therapist, have been afforded only minimal weight.

(Tr. 492.)

We conclude that the ALJ erred in this analysis for several

reasons. First, his description mischaracterizes the scope of FCE

recommendation; that is, while the report does state that Ms.

Altman was "best suited for sedentary work" with no more than

occasional lifting and carrying of light objects and occasional

walking or standing, the summary section of the report states that

Plaintiff could perform sedentary work only on a part-time basis

with the additional requirements noted above. (Tr. 468.) Second,

there are several copies of the FCE in the record which appear to

show Dr. Gaul's signature,[17] including one dated April 20, 2003,

---

[17] Like the Third Circuit Court of Appeals and the Appeals
Council, this Court cannot decipher the "scrawls" at Tr. 462, 468 and
475, but will assume, based on the similarities of the scrawls and the
initials "TPG" at Tr. 475, as well as other examples of his signature

23

only about two weeks after the examination was performed (and three days after the report was transcribed), not more than two months later as the ALJ stated. (*Compare* Tr. 475 to Tr. 462 and 468, the first and last pages of Exhibit 24F which was admitted at the hearing, Tr. 67.) Moreover, the Court is unaware of any regulation or Social Security Ruling which requires that the acceptable medical source be present during or participate in such an evaluation, or that he review and approve it within a specific period of time. In fact, the ALJ specifically stated that he would hold the record open for the FCE report to be admitted as Exhibit 24F (Tr. 32, 67) which indicates that Dr. Gaul first reviewed the report on April 20, 2003 (*see* Tr. 262). Finally, pursuant not only to SSR 06-3p but to Social Security regulations as well, while only "acceptable medical sources" can provide evidence to establish the existence of a medically determinable impairment, information from "other sources," e.g., therapists, may be used "to show the severity of [a claimant's] impairment(s) and how it affects [her] ability to work." 20 C.F.R. § § 404.1527(a)(2) and 404.1513(d). At no point in his October 2006 opinion does the ALJ question the diagnosis of Plaintiff's fibromyalgia; the only question was whether its severity, alone or in combination with other impairments, precluded Ms. Altman from any form of substantial

_____

(*see*, e.g., Tr. 1123-1125), that they all were the signatures of Dr. Timothy P. Gaul.

24

gainful activity. Since the therapists' report goes directly to the latter question, it should have been considered by the ALJ.

We also conclude that the ALJ failed to observe the Appeals Council instruction that he should "expressly evaluate the June 20, 2003 medical source opinion[18] . . . under the applicable guidelines (20 CFR 404.1527 and Social Security Rulings 96-2p and 96-5p.)" Since the regulation and Rulings cited by the Council concern opinions offered by acceptable medical sources, it is logical to conclude that both the Third Circuit Court of Appeals and the Appeals Council interpreted Dr. Gaul's signature as evidence that he had reviewed and approved the recommendations in the therapists' report, adding additional weight to their findings. The Court can find no substantive analysis pursuant to Ruling 96-2p, "Giving Controlling Weight to Treating Source Medical Opinions," or 96-5p, "Medical Source Opinions on Issues Reserved to the Commissioner," in the ALJ's opinion. Furthermore, SSR 06-3p was published at least two months prior to the date on which the ALJ entered his October 2006 opinion. According to that Ruling, he should have evaluated the therapists' report in terms of the factors listed therein which parallel the factors by which the opinions of acceptable medical sources are evaluated. No such analysis appears in the ALJ's October 2006 opinion.

---

[18] The content of the June 20, 2003 and the April 20, 2003 copies of the FCE is identical except that the former has added a signature block at the end where Dr. Gaul's signature appears following the phrase "I have reviewed the treatment planned and concur." (Tr. 475.)

25

4. *The ALJ's Consideration of Dr. Gaul's November 12, 2004 Opinion:* In its remand instructions, the Appeals Council also directed the ALJ to "clarify how he has considered all aspects of Dr. Gaul's November 2004 medical source statement" and explain the reasons for the weight he gave to that opinion evidence as well. (Tr. 511.) Again, we conclude the ALJ failed to satisfy this requirement.

On November 12, 2004, Dr. Gaul prepared a "Physician's Report" to which was attached a "Physical Capacities Evaluation." (Tr. 1184-1191.) In the latter, Dr. Gaul indicated that Plaintiff could sit for a full eight-hour workday, stand for up to 4 hours, walk for 2 hours, and drive for 4 hours. She could frequently lift up to 10 pounds and occasionally lift up to 20 pounds. She could use both hands for repetitive simple grasping and fine manipulations, but could not push or pull and could use both feet for repetitively operating foot controls. The only postural limitation which Plaintiff could never perform was crawling; all others (bending, squatting, climbing, and reaching above shoulder level) could be done occasionally. There were no more than mild restrictions due to environmental limitations. (Tr. 1187.)

Immediately after his discussion of the therapists' report summarized in the previous section, the ALJ commented:

Moreover, this physician [Dr. Gaul] subsequently reported that the claimant had the ability to perform a reduced

26

range of light exertion (Exhibit B27F),[19] without providing any explanation for the discrepancies in his opinions.

(Tr. 492.)

These alleged "discrepancies" were another reason cited by the ALJ for giving Dr. Gaul's opinions "only minimal weight." (Tr. 492.) While it is true that Dr. Gaul's physical capacities evaluation supports the ALJ's conclusion that Plaintiff could perform "a reduced range of light exertion," the ALJ failed to address at least three other relevant points in the Physician's Report, despite Appeals Council's admonition to clarify how he had considered "all aspects" of that report. First, the October 2006 opinion does not address Dr. Gaul's indication that in performing various activities, Plaintiff's pain "could be tolerated but would cause [a] marked handicap in the performance of the activity precipitating pain." Nor did the ALJ consider Dr. Gaul's opinion that Ms. Altman would need frequent rest periods during the day and would probably miss work due to exacerbations of pain on a frequent basis.[20] (Tr. 1188.) Finally, Dr. Gaul had opined that Ms. Altman

---

[19]  Although the Court has been unable to identify in the record Exhibit B27F to which the ALJ refers, we assume that Exhibit B19F, a report dated November 12, 2004 (Tr. 1184-1191), is the one in question, especially since it is noted as being an exhibit received during the hearing.

[20]  The Court recognizes that, as the Third Circuit has noted, a report which requires the physician "only to check boxes and briefly fill in blanks" is "weak evidence at best," and where "these so-called reports are unaccompanied by thorough written reports, their reliability is suspect." Mason, 994 F.2d at 1065; see also Dula v. Barnhart, No. 04-3176, 2005 U.S. App. LEXIS 7735, *7, n.1 (3d Cir. May

could "engage in employment on a regular, sustained, competitive and productive basis" only if the situation was "not more stressful than her present house work – she would not do well [with] both housework [and] job together." (Tr. 1186.)[21]

These omissions are of special concern because the Appeals Council had explicitly pointed out that when discussing the Physician's Report in the December 2004 opinion, the ALJ failed to clarify how he had taken into account Dr. Gaul's view that Plaintiff would "frequently" need rest periods during the day;[22]

---

3, 2005), noting that nonetheless Social Security regulations require the ALJ to consider such reports. However, the Court finds that the conclusions of the "check-the-box" Physician's Report are consistent with Dr. Gaul's extensive office notes, his letter of December 29, 2003 to the Pennsylvania State Bureau of Disability Determination (Tr. 1123-1125), and the April 8, 2003 therapists' reports.

[21] The Court notes that during the hearing, the ALJ received another physician's report, that of Dr. David B. Hamilton, a chiropractor, dated August 31, 2006. (Tr. 636-779.) Dr. Hamilton found Ms. Altman's pain was sufficiently severe so as to entirely preclude any work-related activity that caused pain (a more restrictive view than that of Dr. Gaul) and that she would need frequent rests periods and would probably miss work frequently due to her condition (the same finding as that of Dr. Gaul.) (Tr. 640.) The Court cannot find any reference to this report (Exhibit 32F) in the ALJ's October 2006 opinion, even though the record shows Dr. Hamilton had been treating Plaintiff since July 2002, well before her date last insured.

[22] This opinion is consistent with Dr. Gaul's statement in a letter of December 29, 2003 in which he noted that Plaintiff had "easy fatigue which greatly hampers her ability to function in the day to day care of her family and household." (Tr. 1124-1125.) The ALJ gave this statement only "minimal weight" because it was "supported only by the claimant's subjective allegations and not by the minimal findings made [on] physical examination, diagnostic study, or the claimant's conservative course of treatment." (Tr. 492.) As discussed above, the existence or severity of fibromyalgia is not readily amenable to objective diagnosis. Moreover, the generally accepted course of treatment is a combination of pain relieving medication, muscle relaxants and/or antidepressants, combined with physical therapy,

28

the Council explicitly directed the ALJ to address this issue on remand. (Tr. 511, *citing* Tr. 1188.) The Court has been unable to find any discussion of these points in the October 2006 opinion, all of which go directly to the question of Plaintiff's maximum ability to work on a regular basis, i.e., eight hours a day, five days a week or an equivalent work schedule. *See* SSR 96-9.

5. *The ALJ's Other Reasons for Giving Less Than Controlling Weight to Dr. Gaul's Opinions:* In affording Dr. Gaul's opinions "only minimal weight," the ALJ stated:

> Furthermore, this doctor's office treatment records, as discussed above, do not contain the objective signs, symptoms, findings, or functional restrictions to support his opinions, but indicate the claimant is not following treatment as prescribed and that her symptoms do improve when she does follow prescribed treatment.

(Tr. 492.)

We first consider the ALJ's finding that Dr. Gaul's treatment records did not contain the "objective signs, symptoms, findings, or functional restrictions to support his opinions." Unlike other diseases and conditions for which the severity and limiting aspects can be objectively tested, determining the impact of fibromyalgia on a claimant's RFC depends largely on the claimant's own reports of the pain, fatigue, and other subjective symptoms associated with

exercise, acupuncture, biofeedback, and psychotherapy, according to what is effective for each individual. See entries for fibromyalgia treatment, alternative therapies, and disease management under "health topics" at MedlinePlus. The record shows that Ms. Altman had tried most if not all of these therapies plus trigger point injections.

29

the disease. *See*, e.g., Dr. Gaul's comment in his Physician's Report, "as [with] most fibromyalgia [patients], no objective findings." (Tr. 1186.) As Chief Judge Posner pointed out in a comparable case, the cause or causes of fibromyalgia are unknown, "there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective," that is, "there are no laboratory tests for the presence or severity of fibromyalgia." Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996). As another Circuit Court of Appeals commented, this makes "a treating physician's determination that a patient is disabled due to fibromyalgia . . . even more valuable because there are no objective signs of severity and the physician must interpret the data for the reader." Stewart v. Apfel, No. 99-6132, 2000 U.S. App. LEXIS 33214, *9 (11th Cir. Dec. 20, 2000). In short, an adjudicator errs when requiring "'objective' evidence for a disease that eludes such measurement." Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003).

Moreover, as part of the FCE by the occupational and physical therapists, Plaintiff underwent two standardized tests to measure pain and, more significantly, the possibility that an individual is exaggerating the symptoms. Plaintiff's reports of pain on the Borg pain summary were described as "consistent." On the McGill Pain questionnaire administered before the physical therapy exam, Plaintiff scored 33 which, according to the therapists, is

30

indicative of symptom magnification. Following the exam, she scored 29 which is not indicative of symptom magnification. (Tr. 463.) However, the therapists concluded that "due to [the] chronic nature of pain with fibromyalgia and [Ms. Altman's] consistent effort and appropriate behavior throughout testing, it is felt that these scores reflect chronic pain and not a lack of sincere effort." (Tr. 468.) Thus, to the extent that a subjective factor such as pain may be objectively measured and the possibility of symptom magnification or exaggeration minimized, the record contains such "objective" evidence which should have been considered.

Most importantly, "objective" findings are not required in order to find that an applicant is disabled. As the Third Circuit Court of Appeals has stated,

the standard as to subjective pain requires: (1) that subjective complaints of pain be seriously considered, even where not fully confirmed by objective medical evidence; (2) that subjective pain "may support a claim for disability benefits," and "may be disabling"; (3) that where such complaints are supported by medical evidence, they should be given great weight; and (4) that where a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount claimant's pain without contrary medical evidence.

Romani v. Comm'r of Soc. Sec., No. 01-3853, 2002 U.S. App. LEXIS 24690, *7 (3d Cir. May 14, 2002), *quoting* Green v. Schweiker, 749 F.2d 1066, 1068 (3d Cir. 1984) (citations omitted).

Dr. Gaul's office notes are replete with references to Plaintiff's ongoing pain and his numerous attempts to prescribe drugs to alleviate it. Similarly, records from Latrobe Area

31

Hospital, from Plaintiff's clinical counselor, and from Dr. Ronald
Glick[23] with whom Plaintiff consulted for pain management all refer
to episodes of debilitating pain and varying degrees of chronic
pain as well as other subjective complaints such as severe fatigue,
mood swings, and migraine headaches. And, although the ALJ pointed
to many activities of daily living which he found contradicted the
severity of Plaintiff's reported pain, he did not identify contrary
*medical* evidence which would undercut her reports.

Next, we consider the ALJ's conclusion that little weight
should be given to Dr. Gaul's opinions because his office notes
"indicate the claimant is not following treatment as prescribed and
that her symptoms do improve when she does follow prescribed
treatment." Since the ALJ fails to identify any doctor by name in
the October 2006 opinion, this sentence is somewhat ambiguous, but
it appears from the context that he is referring to an earlier
section of his decision discussing Plaintiff's credibility where he
stated in relevant part:

. . . [O]ne physician has consistently indicated that the
claimant should engage in aerobic exercise or an exercise
program to help relieve her conditions, and she has
consistently failed or refused to do so (Exhibits 19F,
B12F). In addition, the claimant has not been fully
compliant with treatment, trying to get medications not
approved by her primary care physician in connection with
her fibromyalgia. In a report dated July 2004, this
physician noted that the claimant coped much better with

---

[23] Dr. Glick was a consulting physician specializing in
complementary medicine who saw Plaintiff only on November 20, 2002,
for pain management. (Tr. 1032-1033.)

her fibromyalgia when she used medications he prescribed for her (Exhibit B20F). While the claimant complains of some side effects from the use of medications, the medical evidence contains no evidence of significant adverse consequences from the use of medications.

(Tr. 491.)

The doctor who suggested in Exhibits 19F and B12F that Plaintiff engage in aerobic exercise was Dr. Neil Braunstein with whom Plaintiff consulted on four occasions over a one-year period. He initially evaluated Ms. Altman on July 24, 2002, at Dr. Gaul's recommendation. After summarizing Ms. Altman's medical history to date including troubled sleep, persistent headaches, occasional symptoms of irritable bowel syndrome, and severe fatigue, he agreed that Ms. Altman should continue taking guarifenesin although he was "not specifically aware of the benefits" of the medication in treating fibromyalgia, and prescribed flexeril[24] to regulate her sleep cycles and decrease muscle spasms. He concluded, "I encouraged the patient very strongly that she needs to start on some kind of aerobic exercise program. . . . I recommend swimming because of the low stress on the joints." (Tr. 552-554.)

---

[24] Guarifenesin is generally prescribed for relief of coughs associated with colds, bronchitis and other lung infections. *See* drugs and supplements at MedlinePlus. The use of guarifenesin is an experimental alternative treatment for fibromyalgia which has not been approved by the Food and Drug Administration nor shown to be effective in clinical trials as of 2005. Based on anecdotal evidence of success, however, it has been adopted by some fibromyalgia patients. *See* Guarifenesin Protocol at www.wikipedia.org., last visited December 17, 2007. Flexeril (cyclobenzaprine) is a muscle relaxant used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort. *See* drugs and supplements at MedlinePlus.

At the next appointment on November 18, 2002, Dr. Braunstein noted that Ms. Altman had stopped taking guarifenesin and had tried flexeril which had helped her sleeping difficulties. However, she had recently been prescribed wellbutrin for depression and klonopin[25] for sleep and stopped taking flexeril. Again, he noted Ms. Altman was not doing "appropriate exercise." (Tr. 550-551.)

In April 2003, Ms. Altman reported that her previous trials of wellbutrin and klonopin were unsuccessful after a one month and were discontinued. Dr. Braunstein considered that this was "generally too soon to assess response to an anti-depressant," and again prescribed wellbutrin, flexeril, and guarifenesin. He noted that "depression, dysregulated sleep and lack of exercise were creating symptoms of fibromyalgia." (Tr. 548-549.)

At the final recorded appointment with Ms. Altman on July 24, 2003, Dr. Braunstein noted, "Patient did not inform me but she decided to self-discontinue her wellbutrin and her flexeril." He also noted that she was trying other "non-approved medicines" for fibromyalgia including ritalin and strattera.[26] Although Ms. Altman

---

[25] Wellbutrin (bupropion) is used to treat depression and klonopin (clonazepam) is used to relieve anxiety, among other uses. *See* drugs and supplements at MedlinePlus.

[26] Ritalin (methylphenidate) is one of a class of medications called central nervous system stimulants which is usually prescribed as part of a treatment program for attention deficit hyperactivity disorder ("ADHD.") Strattera (atomoxetine) is also used to treat children and adults with ADHD but is in a class of medications called selective norepinephrine reuptake inhibitors which work by increasing the levels of norepinephrine, a natural substance in the brain that is needed to control behavior. *See* drugs and supplements at MedlinePlus.

34

stated that "she thought she felt better on the ritalin," Dr. Braunstein noted that he did not write prescriptions for either of these medications. He concluded:

> I explained to the patient that I have discussed with her in the past how I prefer to manage fibromyalgia, focusing on the underlying etiology of depression and dealing with sleep deprivation and enforcing an exercise program. The patient has instead decided to go off on her own and try alternative therapies; however, she is thinking about trying to go back on an anti-depressant, although she is not convinced at this time that it is something that she wants to do.

(Tr. 546-547.)

The Court has been unable to identify any point in Dr. Gaul's office records where he suggested an aerobic exercise program or any other treatment with which Ms. Altman was not compliant. In fact, if the ALJ intended to indicate he was giving significant weight[27] to the fact that Ms. Altman failed to follow Dr. Braunstein's suggestion to engage in regular aerobic exercise, he should have also determined whether failure to follow a prescribed treatment was justified.[28] *See* SSR 82-59, "Failure to Follow Prescribed Treatment," indicating that such failures only become an

---

[27] The ALJ never explained the relative weights he gave to the opinions of Dr. Gaul and Dr. Braunstein, but it is clear from the criteria set out in 20 C.F.R. § 404.1527 that greater weight probably should have been given to Dr. Gaul's opinions based on the length of the treatment relationship and the frequency of treatment, despite the fact that Dr. Braunstein was a specialist in rheumatology.

[28] There is evidence in the record that Ms. Altman was walking for exercise (Tr. 475) and exercising "daily" (Tr. 341), but her tolerance for even mild exercise was limited due to extreme fatigue (Tr. 1127.)

35

issue when the treatment is prescribed by a treating source, it is expected to restore a claimant's ability to work, and there is no "justifiable cause" for failure to follow the treatment.

Moreover, despite a careful review by the Court of the voluminous medical records, the only apparent reference to "unapproved medications" for fibromyalgia is in Dr. Braunstein's notes of July 24, 2003, not those of Dr. Gaul. But, in fact, the medications which Dr. Braunstein and the ALJ described as "non-approved," ritalin and strattera, were prescribed by Dr. Gaul on April 7, 2003, when he wrote:

> We haven't made any major advances in pain relief or fatigue. . .utilizing various combinations of anti-depressants, analgesia, muscle relaxers, [complementary and alternative medicine.] She has had visits to rheumatology, to Dr. Glick and alternative medicine practitioners. At this point, we're treating on the outside end of the "envelope." In an effort to improve her fatigue, I'll give her low dose Ritalin at 5 mg b.i.d. [and] . . . increase to 10 mg as tolerated and further if need be. . . . [Dr. Braunstein] has recommended restarting Wellbutrin and Flexeril and I think the Wellbutrin is a good idea. I'll wait and see how she does with the Ritalin first. If her mood worsens on the stimulant, then of course we'd start Wellbutrin quickly.

(Tr. 1213.)

Dr. Gaul increased her dosage of ritalin on May 16, 2003 (Tr. 1214-1215), but substituted strattera on June 20, 2003, after Ms. Altman reported feeling "dysphoric" from the increased ritalin. (Tr. 1216-1217.) Based on this evidence, the ALJ's finding that Ms. Altman was "trying to get medications not approved by her

primary care physician in connection with her fibromyalgia" is not an accurate reflection of the record.

Next, the ALJ cites to Exhibit B20F, a report dated July 2004, in support of his finding that "this physician" reported Plaintiff coped much better when she used medications he prescribed. In the context of the ALJ's discussion, "this physician" appears to be a reference to Dr. Braunstein, but the exhibit cited is part of Dr. Gaul's office records; Dr. Braunstein did not treat Plaintiff after July 2003. The only notes from Dr. Gaul dating from July 2004 are those of July 13, where he reported that "she is coping much better with the fibromyalgia," but there is no reference to a correlation between coping better and using the medications prescribed. (Tr. 1239-1241.)

Finally, contrary to the ALJ's conclusion that "the medical evidence contains no evidence of significant adverse consequences from the use of medications," notes from Drs. Gaul, Braunstein, and Glick all report side effects and lack of benefit from specific drugs. For example, Dr. Braunstein commented that celebrex, effexor, and prednisone had been of "no benefit" and that Plaintiff had not been able to tolerate effexor and serzone due to side effects (Tr. 552-554); Dr. Gaul noted trigger point injections had given her an "untoward side effect," prednisone made her feel "hyperagitated and irritable," remeron helped her sleep and improved her mood but even a minimal dose caused a "lot of hangover

37

and palpitations," and she had not tolerated selective serotonin re-uptake inhibitors well (Tr. 1212-1213; 333-334; 1235-1236; 616-618, respectively); and Dr. Glick noted that non-steroids had been of "no help" and psychotropic medications, including serzone, tranxene and effexor, resulted in nausea and sedation (Tr. 1032-1033). Plaintiff testified that she was no longer taking paxil for depression because it made her sick and that when she had taken neurontin for pain, she "ended up in the hospital . . . with bad chest pain and [her] right arm was numb and turning blue." (Tr. 1384.) Therefore, the ALJ's conclusion that Plaintiff did not have "significant adverse consequences" from her medications is not supported by substantial evidence.

We conclude that the ALJ failed to give proper weight to Dr. Gaul's medical opinions, the therapists' FCE evaluation, and other medical evidence of record which would support a finding that Plaintiff's disability was sufficiently severe so as to preclude her from any substantial gainful activity. The ALJ does not point to evidence from other treating or consulting medical sources which would contradict Dr. Gaul's opinions and, in fact, gave only minimal weight to the opinion of a one-time consulting physician who also found that Plaintiff would be limited to sedentary work. (*See* Tr. 492, *citing* Tr. 341-345.) We find, therefore, that the ALJ's conclusion that Plaintiff could perform a limited range of light unskilled work is not based on substantial evidence.

## V. FURTHER PROCEEDINGS

When the Social Security Appeals Council remands a case to an ALJ with instructions to take certain actions, failure follow those instructions may constitute reversible error. Lok v. Barnhart, CA No. 04-3528, 2005 U.S. Dist. LEXIS 20836 at *7 (E.D. Pa. Sept. 19, 2005); *see also* 20 C.F.R. § 404.977(b), stating that the ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." Similarly, failure to adhere to a court's remand order is also legal error. Thompson v. Barnhart, CA No. 05-395, 2006 U.S. Dist. LEXIS 11053, *32 (E.D. Pa. Mar. 17, 2006), *citing* Sullivan v. Hudson, 490 U.S. 877, 886 (1989) ("deviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review.")

Here, among other omissions,[29] the ALJ did not follow the instructions by the Appeals Council to consider "all aspects" of Dr. Gaul's November 2004 statement, nor "expressly evaluate" the therapists' April 8, 2003 report as approved by Dr. Gaul. (Tr. 511-512.) Moreover, in considering the June 20, 2003 report, which

---

[29] The Appeals Council had also directed the ALJ to incorporate social functioning limitations into the hypothetical question and to explain his findings regarding Plaintiff's RFC "in terms of the function-by-function assessment" set out in SSR 96-8p. (Tr. 511-512.) Plaintiff does not raise any specific arguments regarding these points in her brief and in light of the Court's ultimate decision, we conclude they need not be addressed herein.

the Third Circuit Court of Appeals had referred to as a "physician's report," the ALJ rejected the findings therein for reasons this Court finds less than persuasive, i.e., Dr. Gaul's lack of participation in the evaluation and the date on which it was formally approved, and without taking into consideration the provisions of SSR 06-3p. *See* Rutherford, 399 F.3d at 554 (an ALJ may not "reject evidence for no reason or for the wrong reason.")

"A district court, after reviewing the decision of the Commissioner, may under 42 U.S.C. § 405(g) affirm, modify, or reverse the Commissioner's decision with or without a remand to the Commissioner for a rehearing." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 549 (3d Cir. 2003). However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), *quoting* Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

We conclude that this is one of those relatively rare instances in which benefits may be awarded without further development of the record or further consideration by the ALJ. There is no substantial medical evidence which conflicts with Dr. Gaul's opinions as to the severity and effects of Plaintiff's fibromyalgia, opinions which should have been given controlling –

or at least great – weight by the ALJ. Had he done so, he would have concluded without question at step five of the analysis that Ms. Altman was disabled. We therefore grant Plaintiff's motion for summary judgment, reverse the Commissioner's October 27, 2006 decision, and remand for determination of Plaintiff's disability onset date and award of disability insurance benefits. An appropriate order follows.

December __18__, 2007

William L. Standish
United States District Judge

cc: Counsel of Record

41